## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **ELIZABETH ARIAS,** | § | |
| **Plaintiff** | § | |
| **V.** | § | **CIVIL ACTION NO. C-05-41** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION

Elizabeth Arias filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Plaintiff filed a brief in support of her original complaint on July 21, 2005 and defendant filed a response to the brief on August 8, 2005 (D.E. 14, 15).  Plaintiff filed a reply to defendant's response on August 22, 2005 (D.E. 16).  Also pending is plaintiff's motion to consider new and material evidence and/or to compel the Commissioner to complete the record (D.E. 12-1, 12-2) to which defendant responded in her response to the brief in support of plaintiff's complaint.

## BACKGROUND

Plaintiff filed her applications on August 6, 2002 and they were denied at all administrative levels (Tr. 59-66, 27-33, 35-38, 12-24, 4-6, 587-589, 591-597, 599-601).  Plaintiff alleges an inability to work since January 15, 2002 because of degenerative joint disease and a mood adjustment order (Tr. 25-26, 76).  Her symptoms include pain in her back, neck and shoulders and all down her left side.  In addition, she has pseudo-seizures[1] (Tr. 76, 80, 68, 70,

---

[1]An attack resembling an epileptic seizure but having purely psychological causes; it lacks the electroencephalographic characteristics of epilepsy and the patient may be able to stop it by an

103-108).  Plaintiff was 39 years old at the time of the hearing and had attended school through the

eighth grade (Tr. 634-635).  Prior to becoming disabled she worked as a home health care

provider and certified nurse's assistant (Tr. 77).

## MEDICAL EVIDENCE

In August 1990 plaintiff was hospitalized for nine days with a diagnosis of major

depression and bulimia, after presenting with uncontrollable crying, low energy, sleep disturbance,

feelings of helplessness and hopelessness and a general inability to function or concentrate.  Her

urine drug screen was positive for benzodiazepines.  She was prescribed Prozac and released with

a referral to outpatient counseling (Tr. 252-262).

In June 1998 plaintiff saw a neurologist complaining of chronic low back pain and daily

tension headaches.  She was taking one or two Lorcet every two to three hours for up to six or

seven per day.  The doctor suspected she was suffering from rebound headaches and he asked her

to taper off the Lorcet.  He also prescribed a low dose of Elavil to help with the chronic pain (Tr.

465-467).  In October 1998 plaintiff underwent a psychosocial evaluation.  She was tearful and

had numerous somatic complaints of chronic pain.  She was assessed with major depression,

recurrent without psychotic features, and also generalized anxiety, with a current GAF[2] of 40 and a

act of will.  Dorland's Illustrated Medical Dictionary, 29th Ed., (2000).

[2]The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  A GAF of 31-40 indicates that some impairment in reality testing or communication (e.g. speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., 2000.

GAF for the past year of 50-60[3].  It was recommended that she undergo a full psychiatric

evaluation and medication assessment as well as insight oriented psychotherapy, which she did

(Tr. 210-215).  During therapy she discussed her 18-year history of bulimia (Tr. 203-209).

In November 1998 the neurologist examined plaintiff again and the examination was

objectively normal, although she reported having been in the hospital twice for pain control.  She

was taking Celexa, Remeron and Ultram (Tr. 458).  In February 1999, Dr. Praderio, a psychiatrist,

diagnosed plaintiff with major depression, recurrent, without psychotic features, a generalized

anxiety disorder, bulimia nervosa and an unspecified eating order and made a provisional

diagnosis of a somatoform disorder (Tr. 201-202).  Plaintiff participated in individual therapy

throughout most of 1999 (Tr. 192-198).  In December 1999 her GAF was 50[4] (Tr. 193).

In February 2000 plaintiff reported that she had been charged with driving while

intoxicated and also that she had been on probation for the previous five years on cocaine charges

(Tr. 191).  In March 2000 she reported that she had been attending GED classes (Tr. 190).

Plaintiff was taking Celexa and Klonopin and Dr. Praderio assessed her with a GAF of 35 (Tr.

189).  From March 2000 through February 2003, Dr. Praderio continued to assess plaintiff with a

GAF of 35 (Tr. 180-190).

In January of 2002 plaintiff told the neurologist, Dr. Longwell, that she had constant daily

headaches during the previous two months.  She was taking three Lortab a day and also 800

---

[3]A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).

[4]A GAF 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

milligrams of ibuprofen twice a day and 10 milligrams of Flexeril twice a day.  She also had

lightheadedness and some numbness associated with the headaches and occasionally had blurred

vision and saw flashes of light (Tr. 456).  Her neurologic exam was objectively normal.  Dr.

Longwell thought she was having rebound headaches and asked her to stop all analgesics for three

weeks.  He prescribed Elavil for headache prophylaxis (Tr. 457).

On March 3, 2002, plaintiff underwent an elective total abdominal hysterectomy and

bilateral salpingo-oophorectomy secondary to pelvic pain, heavy menorrhagia, bilateral ovarian

cysts and potential endometriosis (Tr. 334-335).  On March 13, 2002 plaintiff saw Dr. Longwell

again, still complaining of headaches and whole body pain.  She told him she was not taking the

Elavil, but was taking pain medication instead, because of her hysterectomy.  Her exam and

laboratory results were normal, except for some chronic sinusitis.  Dr. Longwell was uncertain of

the cause of her refractory pain, but told her he had nothing further to offer her, especially in light

of the fact that she had not followed his advice regarding treatment.  He suggested she see another

neurologist and thought she might benefit from the care of a pain specialist (Tr. 451).

On March 25, 2002 X-rays of plaintiff's spine revealed levoscoliosis with degenerative

disc disease with disc space narrowing at L2-3, L3-4 and L4-5 with degenerative changes and

spurring (Tr. 324).  Plaintiff went to the emergency room complaining of low back pain on June

20, 2002.  She had a rather bizarre affect and indicated she could neither describe nor point to her

pain.  Her mother provided most of the patient's history.  The doctor described plaintiff's response

to her pain as childish and immature and said it appeared there was a significant emotional overlay

involved in her complaints.  She was treated with pain medication and obtained adequate relief

(Tr. 307).  An MRI done on June 25, 2002 showed no definite disc herniation and no spinal

stenosis (Tr. 305).

4

On July 14, 2002 plaintiff was admitted to the emergency room in a fetal position, twitching, moaning and phonating a few words.  She was complaining of pain in her neck, back and chest.  Records showed she had been worked up previously for the same type of complaints, the etiology of which was unclear.  She had numbness in her left hand and leg (Tr. 298).  She was in mild to moderate distress with episodes of spasms in her back (Tr. 299).  She was taking Lorcet, Protonix, Klonopin, Premarin, Celexa, and Neurontin (Tr. 298).  Results of blood tests revealed significant eosinophilia, leukopenia and evolving anemia and the emergency room doctor suggested she follow up with her family doctor for reevaluation or referral (Tr. 300).

Plaintiff returned to the emergency room on July 24, 2002 with body spasms and back pain with shaking of her upper and lower extremities. She was described as having a pseudo- seizure and given Ativan, Demerol and Phenergan with good relief of pain (Tr. 291-292).  On July 29, 2002 plaintiff returned to the emergency room with complaints of low back and neck pain and vomiting.  She was moaning, crying and asking for pain medication.  She was given Demerol, Toradol, Phenergan and Ativan (Tr. 277-280).  Plaintiff returned to the emergency room the next day complaining about neck and back pain and was given Vistaril, Pepcid, Stadol and Ativan which relieved her pain (Tr. 272-275).

Plaintiff presented to the emergency room again on September 27, 2002 with left-sided pain.  The doctor noted that her medical history was positive for this functional pain, Munchausen's by proxy and bulimia.  She was prescribed Toradol and Flexeril (Tr. 266-267).

On October 7, 2002 an X-ray of plaintiff's mid-lumbar spine showed advanced degenerative changes, but it was stable (Tr. 246).  She was diagnosed with chronic low back syndrome and depression (Tr. 242-245).  On October 28, 2002 plaintiff went to the emergency room with generalized extremity shaking associated with frothing at the mouth.  Her medical

5

history was noted and she was assessed with pseudo-seizures and pain (Tr. 240-242).  An EEG

was abnormal for the presence of epileptiform discharge lasting approximately four seconds,

arising in the bilateral posterior, parietal regions.  Although there was evidence of brief seizure

activity, there was no constant seizure activity during plaintiff's clinical spells which were

documented on the recording.  An MRI of plaintiff's brain was cancelled because she was

uncooperative, as was a second EEG.  She was diagnosed with pseudo-seizures with possible

underlying brief partial complex seizures.  She also complained of back and neck pain for which

she requested medication.  She was given Lortab for pain and Dilantin and Neurontin for seizure

prophylaxis (Tr. 238-239).

On November 6, 2002 plaintiff went to the emergency room with an altered state of

consciousness.  She was dizzy and had an unsteady gait.  She was assessed with Dilantin toxicity,

chronic back pain and chronic headaches and was treated with repeat activated charcoal (Tr. 227-

228).  She also was treated for pneumonia (Tr. 229-237).  During that hospital stay, plaintiff saw

Dr. Escobar, a neurologist, who examined her and assessed her with seizures and pseudo-seizures.

He also noted that plaintiff had a decubitus ulcer on her sacral spine, lumbar stenosis and chronic

pain syndrome (Tr. 167).

Plaintiff underwent a consultative psychiatric evaluation by Cecil Childers, M.D., on

December 13, 2002.  After examining plaintiff and administering tests, Dr. Childers diagnosed her

with a mood adjustment disorder and depression secondary to constant physical pain and he

assigned a GAF of 60 (Tr. 218-224).  On January 29, 2003 plaintiff saw Dr. Escobar and reported

that she had had only one spell of pseudo-seizures and decompensation since December.  She was

tearful as she described right-sided pain and said she probably would never be able to do anything

in the future (Tr. 164).

6

Plaintiff went to the emergency room with possible seizures on January 31, 2003.  It was noted that she was well-known in the emergency room and was having typical seizure activity.  She also was vomiting and complaining of chronic back pain.  Her laboratory results were normal (Tr. 560-561).

On February 16, 2003 plaintiff voluntarily was admitted to the hospital after Dr. Praderio saw her as an outpatient and she was acutely decompensated with crying spells and mild suicidal ideations and complaining of physical discomforts and chronic pain.  She was diagnosed with major depression, recurrent, without psychotic features, and a somatization disorder.  Dr. Praderio wanted to rule out a dissociative order, not otherwise specified.  He also diagnosed plaintiff with a personality disorder, not otherwise specified with dependent histrionic traits and assigned her a GAF of 30[5].  During her hospital stay, Dr. Praderio saw plaintiff go to the floor and start seizing, but he thought it was very uncharacteristic seizure activity and overall she was curving and responding to his questioning and stating that she could not stand the back pain any longer.  He asked her to stand up and she partially helped.  He opined that the seizure was more of a component of the patient's psychogenic dissociative and somatic presentation, but nevertheless ordered a complete neurological work up (Tr. 409-413).

Dr. McFarland, the neurologist, reviewed plaintiff's history and examined her, determining that she had no known neurological disorder as far as he could tell.  He witnessed one of her seizures and stated that the characteristics were unequivocally those of psychogenic pseudo-seizures.  He said he did not think she needed anti-convulsive treatment unless it would help

---

[5]A GAF of 21 to 30 indicates that behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

stabilize her psychiatric condition.  He also noted her chronic neck and back pain and her chronic severe depression (Tr. 414-415).

Plaintiff saw Dr. Escobar during a follow-up appointment on March 5, 2003.  The doctor noted that plaintiff was standing around without much difficulty and when he walked in the room towards the end of the examination she was in severe excruciating pain complaining of spasms and unable to stand.  He was unable to verify whether she was in true pain or not but thought it more likely that it was malingering and a conversion reaction[6] (Tr. 161).

On March 24, 2003 plaintiff once again went to the emergency room with pseudo-seizures and was given Ativan.  She also complained of generalized body aches and pains and was given Toradol (Tr. 534-535).  On March 26, 2003 Dr. Escobar told plaintiff's mother that if she was admitted to the hospital or went to the emergency room one more time with pseudo-seizures that he would cease to treat her.  He told her mother that the only treatment for plaintiff was to ignore her spells.  He continued to treat her low back pain (Tr. 150).

On April 30, 2003 Dr. Escobar noted that plaintiff had twice rescheduled appointments but had not appeared for a follow-up evaluation.  She contacted his office and said that she was in severe pain and wanted more narcotic medication.  Dr. Escobar told her that he no longer would prescribe narcotic medication and told her she should continue on the Neurontin for pain control and keep her appointment (Tr. 572).  In May 2003 plaintiff saw Dr. Praderio who noted that she was doing well, but continued with symptoms of somatization and sadness.  Her diagnosis remained the same and her GAF was 35 (Tr. 586).

---

[6]A conversion disorder is an unconscious defense mechanism by which the anxiety that stems from intrapsychic conflict is converted and expressed in a symbolic somatic manifestation. Dorland's Illustrated Medical Dictionary, 29th Ed., (2000).

8

On June 1, 2003 plaintiff went to the emergency room where she had a pseudo-seizure and complained of back pain.  She requested pain medication and then went into her seizure activity (Tr. 513).  She was given a Valium injection and she promptly stopped the seizure activity and began putting on her clothes to go home (Tr. 514).

On June 12, 2003 plaintiff was admitted to the hospital for observation after she went to the emergency room with seizure-like activity and was described as somnolent for three hours (Tr. 479).  During the hospital stay, an EEG performed during a seizure was described as a normal, awake electroencephalogram showing no epileptic activity whatsoever (Tr. 476-478).  During her hospitalization Dr. Praderio noted that she was tearful and that her affect was restricted with an underlying dysphoria and specifically feelings of hopelessness and helplessness, loneliness and frustration.  Some of her somatization carried the characteristics of being delusional in form.  Dr. Praderio assessed her with major depression, recurrent with psychotic features, a somatization disorder, and a personality disorder of non-specific origin with borderline traits.  Her GAF was 35 (Tr. 474).

**HEARING TESTIMONY**

Plaintiff participated in two hearings.  At the first hearing, held on September 24, 2003, plaintiff testified that she lived in a mobile home with her parents, her two sons, ages 15 and 10, and a nephew.  She was 39 years old and her birthday is on September 9, 1964 (Tr. 616-617).  She completed the eighth grade (Tr. 617).  She last worked two years previously as a nurse's assistant in a nursing home and as a home health care provider (Tr. 617-618).  At the nursing home, she would assist elderly people with their bathing and grooming needs and as a home health

9

provider she cooked, cleaned, washed and helped a man bathe (Tr. 619-620).  She also worked

for a short time as a cook's helper (Tr. 620).

She is 5'6" and weighs about 160 pounds.  She does not smoke, drinks only occasionally

and does not use street drugs (Tr. 620-621).  She had been to the emergency room three weeks

earlier for back pain, which was treated with medication (Tr. 622).  She had been to the

emergency room approximately three times during the previous six months for back pain and

seizures and they gave her Lortab or Demerol (Tr. 623).  Plaintiff denied that any medical

professional had ever told her to stop going to the emergency room or had ever told her that if she

went to the emergency room one more time he would cease to be her doctor.  She also denied

being arrested for a DWI and also denied being on probation for possession of cocaine (Tr. 623-

624).  Plaintiff went to the emergency room for Demerol because it relieved her pain (Tr. 625).

Plaintiff is right-handed, speaks English and Spanish and reads and writes English (Tr.

625).  She possessed a valid driver's license, but had last driven in 1999.  Her mother drives her

when she needs to go somewhere (Tr. 626).  Plaintiff sees Dr. Praderio every three months for

treatment of her depression (Tr. 627).

At this point in the hearing, the ALJ told plaintiff's attorney that he intended to treat the

case as a drug and alcohol abuse case although it had not been labeled that way.  The ALJ

rescheduled the hearing when plaintiff's attorney would not agree to waive the notice requirement

(Tr. 627-628).

At the second hearing, on March 2, 2004, plaintiff's counsel argued that the plaintiff meets

the listing for 12.07, a somatoform disorder, and she pointed out the documents she believed

supported her assertion (Tr. 633-634).  She noted that plaintiff has been diagnosed with

Munchausen by proxy, a somatoform conversion disorder and pseudo-seizures and that she has had GAF scores of 30 and 35.  She also has a past history of bulimia (Tr. 634).

Plaintiff testified that her pain keeps her from concentrating and that it is a sharp pain that she has continuously from head to toe on the left side of her body.  She also has headaches and spasms on her left side and in her back.  In addition, her left leg swells (Tr. 635-636).  She also started having seizures in 2002 that cause her to shake all over, although the seizures begin in her back (Tr. 637).  She does not know how long the seizures last and she has never bitten her tongue or experienced incontinence with a seizure (Tr. 638).

She has periods of sadness and depression and cries about three times per week, although she feels hopeful about the future.  She can walk for 30 minutes and sleeps six or seven hours at night and takes naps about three times per week.  She does not drive because she is afraid to do so (Tr. 638-640).  She can stand for about 10 minutes before she needs to sit down and she can sit for about 30 minutes at a time (Tr. 640-641).

Plaintiff does not take any illegal drugs, but takes only what the doctor prescribes for her pain.  She has not used illegal drugs or alcohol for the past three years (Tr. 641).  Plaintiff no longer suffers from anorexia or bulimia.  She does not like to be around groups of people, but has never had an anxiety or panic attack (Tr. 641-642).

Plaintiff has always lived with her parents although she would like to be out on her own with her children but cannot because of all her problems.  When she and her husband lived together they lived with her parents (Tr. 643-644).  She had to stop working because of the pain she suffers (Tr. 645-646).  She quit the job she had, although she had not had any problems at work (Tr. 646).  The pain is very sharp and in her lower back.  It radiates from her left hip down to her toe and she has numbness in her left fingertips (Tr. 646-647).

11

When she worked as a home health care provider, plaintiff worked about 12 hours per week, preparing meals and cleaning a little bit.  She enjoyed the work, but stopped because of her back pain (Tr. 649).  When she worked at the nursing home it was full time.  She switched to the part-time position when her pain became worse (Tr. 651).  Her other problems, such as the bulimia and the pseudo-seizures, do not keep her from working.  Rather it is the back pain that keeps her from working and the back pain that causes her to have seizures (Tr. 651).  Activities that increase her back pain are bending over to pick something up and sitting.  It sometimes helps for her to stand up and walk around (Tr. 652).  She cannot think of any kind of job that she could do in spite of her back pain (Tr. 653-654).

As far as plaintiff knows, she is not addicted to pain medication.  She does not take too much of the medication and she does not lie to doctors to obtain medication (Tr. 655-656).

She wakes up at 6:30 or 7:00 a.m. to help her children get ready for school.  They take the bus to school.  After they leave for school, she goes back to bed because her back hurts.  Sometimes her mother asks her to stay up, but her mother does not ask plaintiff to find a job and try to do better for herself (Tr. 657-658).  When plaintiff gets out of bed the second time, she does her daily activities at home, such as washing and cleaning the bathroom she shares with her sons (Tr. 659).  She also does laundry and sometimes shops for groceries, which takes about 30 minutes.  Someone has to drop her off at the store (Tr. 661-663).  Plaintiff doesn't enjoy anything but her children.  If she had transportation, she would enjoy going to the beach (Tr. 663-664).

The vocational expert ("VE") testified that plaintiff's work as a certified nurse's aide in the nursing home was of medium exertional level and had a skill level of four.  The work as a home health care provider was medium and semi-skilled and her work at the restaurant was light and semi-skilled (Tr. 665-666).  The ALJ asked the VE to assess the employment possibilities for

12

a hypothetical person with the following characteristics: someone in her mid to late thirties who is literate with a grade-school education and who has the same work history as plaintiff.  The person could lift 20 pounds occasionally and 10 pounds frequently.  She would need a sit/stand option but could maintain a sitting or standing position for 30 minutes.  The person would have a moderately limited ability to carry out detailed instructions, maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.  In addition, the person would have a moderately limited ability to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting (Tr. 666, 128-129).  A "moderate" limitation is not as severe as "marked," but is a noticeable, observable deficit in the person's functioning.  The term "moderate" equates to "fair," meaning a seriously limited areas of functioning, but not a precluded area of functioning (Tr. 666-667).

The VE responded that such a person could do plaintiff's previous work as a home health care provider (Tr. 667-668).  The ALJ modified the question to reflect that the person would have a moderate limitation in her ability to work in coordination and proximity to others without being distracted inordinately and also to require a reasonable number of rest periods (Tr. 669, 128, 129).  The ALJ also added that the person needed seizure precautions such as not working around heights or dangerous machinery (Tr. 669).  The VE testified that a person with those limitations would not be an outstanding employee, but should be able to give a fair performance (Tr. 669-670).  There are approximately 500,000 home health care provider jobs in the national economy and 40,000 such jobs in Texas.

The person could also work as a bench assembler which is sedentary and unskilled with 475,000 such jobs in the national economy and 37,000 in Texas.  In addition, the person could

13

work as a telephone solicitor, which is sedentary and unskilled, with 200,000 jobs nationally and 16,000 in Texas (Tr. 671-672).

The home health care position would not be a danger for a person subject to seizures even though the employee would be alone in the house with a disabled person, unless the person had seizures where she fell down and hurt herself or soiled herself.  A person with that type of seizure should not work as a home health care provider (Tr. 672-673).  If a person missed more than three days of work per month because of her ailments, she would be classified as having a "marked" limitation in her ability to complete a normal workweek without interruptions from psychologically based symptoms (Tr. 674-679, 129).  Missing two days per month is probably tolerable in the work place (Tr. 675).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

### DISCUSSION

The ALJ found that plaintiff had not engaged in substantial gainful work activity since her onset date.  He found that she had degenerative disc disease of the lumbar spine and a major depressive disorder with anxiety, both of which are considered "severe," but not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ also noted that plaintiff had the residual

functional capacity ("RFC") to lift, carry, push or pull up to 20 pounds occasionally and 10 pounds frequently and could stand and/or walk for up to six hours in an eight-hour workday with a sit/stand option at 30 minute intervals; sit for up to two hours in an eight-hour work workday with a sit/stand option at 30-minute intervals; had moderate limitations in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting[7]. The ALJ next concluded that plaintiff could return to her past relevant work as a home health provider/companion, not as she previously performed it at the medium level of exertion, but as it is performed at the light level of exertion with no heavy patient lifting or transferring. She also could perform the work of a bench assembler or telephone solicitor, both of which exist in significant numbers in the national and state economies. The ALJ concluded that plaintiff is not disabled (Tr. 15-24).

Plaintiff asserts that the Commissioner's determination that plaintiff is not disabled is not supported by the evidence. In particular, plaintiff argues that the ALJ failed to properly consider her mental impairment. Defendant counters that substantial evidence supports the ALJ's decision.

**A. Somatoform Disorder**

Under the Social Security regulations, a somatoform disorder is described in the following manner:

---

[7]These are the limitations placed on plaintiff by Richard Alexander, M.D., a state-agency psychiatrist who performed a Residual Functional Capacity assessment of plaintiff (Tr. 128-146).

Physical symptoms for which there are no known demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.  Medically documented by evidence of one of the following:

1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2.  Persistent nonorganic disturbance of one of the following:
a.  Vision; or
b.  Speech; or
c.  Hearing; or
d.  Use of a limb; or
e.  Movement and its control (e.g. coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
f.  Sensation (e.g. diminished or heightened).

3.  Unrealistic interpretation of physical signs or sensations associated with the pre-occupation or belief that one has a serious disease or injury;

And

B.  Resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence or pace; or
4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07.

Plaintiff argues that she meets the listing because her treatment history indicates that she has been diagnosed with a somatoform disorder by her psychiatrist and that her numerous emergency room visits and hospitalizations satisfy the criteria for repeated episodes of decompensation.  The ALJ determined that plaintiff suffers from a major depressive disorder with anxiety but that she did not suffer from a somatoform disorder because there is only occasional mention of it in the record (Tr. 20).

The record shows that Dr. Praderio made a provisional diagnosis of a somatoform disorder in 1999 and most of the doctors who saw plaintiff in the emergency room diagnosed her with pseudo-seizures, which by their definition have a purely psychological cause.  Dr. Praderio assessed her with a somatization disorder in February, May and June 2003.  In March 2003 Dr. Escobar witnessed one of plaintiff's pseudo-seizures and thought it like likely she either was malingering, or having a conversion reaction.  In short, all of the medical professionals involved in plaintiff's care have attributed her seizure activity to psychological causes, which coincides with the listing of somatoform disorders found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07(A)(2)(e).  Accordingly, the ALJ's determination that plaintiff does not suffer from a somatoform disorder because there is only occasional mention of it in the record is not supported by the evidence.

**B.  Residual Functional Capacity**

The ALJ further determined that regardless of the precise mental disorder diagnosis, plaintiff did not meet the severity criteria in Section B of the listing.  In reaching this conclusion, he relied on the residual functional capacity ("RFC") assessment performed by Dr. Alexander, the state agency medical consultant (Tr. 20, 128-146).

While the ALJ is entitled to consider the state agency RFC assessment as opinion evidence, he is supposed to evaluate the findings using relevant factors found in 20 C.F.R. § 404.1527 (a) through (e), such as the physician's or psychologist's medical specialty and expertise in Social Security rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions.  The ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the ALJ must do for any opinions from other medical sources.  20 C.F.R. § 404.1257(f)(2)(ii).

18

The ALJ did not do the proper assessment in this case.  He cited the state agency RFC assessment, stating that it was appropriate for use in vocational evaluation, but did not discuss his reasons for assigning it controlling weight.  Moreover, the ALJ only cited in passing the evidence of the treating psychiatrist, Dr. Praderio, who saw plaintiff over a number of years and who consistently assessed her with GAF scores between 30 and 40.  Nor did the ALJ mention an assessment done by the neurologist, Dr. Escobar, who opined that plaintiff's pseudo-seizures might disrupt the work of co-workers and that she was incapable of even a low-stress job.  He noted specifically that plaintiff has pseudo-seizures about three times per month and they would keep her from working (Tr. 156-160)

Under the regulations, the Commissioner is supposed to give more weight to opinions from treating sources because they are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of a plaintiff's impairments and might bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If the treating physician's opinion on the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the Commissioner is supposed to give it controlling weight.  If he does not give it controlling weight, he is supposed to look at the length, nature and extent of the treating relationship, the frequency of examination, the support provided by other evidence, the consistency of the opinion with the record as a whole and the specialization of the treating physician.  20 C.F.R. § 404.1527(d).

The ALJ can decrease reliance on treating physician testimony for good cause, which includes statements that are brief and conclusory, not supported by medically acceptable clinical

laboratory diagnostic techniques or otherwise unsupported by evidence.  Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted).  However, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating physician, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's view under the criteria set forth in 20 C.F.R. § 404.527(d)(2).  Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000)(emphasis in original).  Also, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

In this case, the ALJ made one mention of the fact that plaintiff had a four-year history of treatment with Dr. Praderio, but in the same paragraph cited only to an intake form completed by a mental health counselor after plaintiff was referred for an assessment in 2002 (Tr. 247).  The ALJ did not otherwise discuss what weight, if any, he gave Dr. Praderio's opinions about plaintiff or the fact that he consistently gave her scores of 30–40 on the GAF scale (Tr. 18).  It was particularly important that the ALJ do so in this case, because the GAF scale is a measure of a person's ability to function and Dr. Praderio's assessment differs significantly from the RFC assessment performed by the state-agency psychiatrist and he assigns a much lower level of functional ability to plaintiff.  Because the ALJ did not include a discussion of the differences in the opinions, or mention any of the Newton factors, the ALJ's decision is not supported by substantial evidence.

20

**C.  Evidence Submitted to Appeals Council**

Plaintiff argues that she submitted evidence to the Appeals Council but the Commissioner did not consider the evidence prior to denying plaintiff's request for review and she asks that the evidence be included in the record.  Plaintiff submitted a copy of a letter she sent to the Appeals Council in which she set forth her argument that meets the listing for a somatoform disorder and also that the ALJ erred when he concluded that plaintiff suffered only mild to moderate limitations as a result of her mental impairment (D.E. 15, Ex. A).  Without embarking on a discussion of the admissibility of new evidence at the district court level, it is clear that what plaintiff wishes to have included in the record is not evidence, but argument, and essentially the same argument she makes to the court in the instant law suit.  Because her arguments have now been considered, her motion to consider "new and material evidence" should be denied.

**RECOMMENDATION**

For the reasons stated above, it is respectfully recommended that plaintiff's brief in support of her complaint, treated as a motion for summary judgment (D.E. 14), be granted. Plaintiff's case should be remanded so that a proper analysis can be made of her treating physicians' assessments of her mental impairments.  In addition, it is recommended that plaintiff's argument to consider new and material evidence (D.E. 12-1, 12-1) be denied.

Respectfully submitted this 17th day of October, 2005.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Services Auto Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).